IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEVAN ARYA,

    Plaintiff,                                    No. 2:11-CV-1354 GEB AC PS

    vs.

CALPERS,

    Defendant.                               FINDINGS & RECOMMENDATIONS

_____/

        On April 10, 2013, the court held a hearing on defendant California Public Employees' Retirement System's ("CalPERS") motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff Kevan Arya appeared in pro per. D. Greg Valenza appeared for defendant. On review of the motion, the documents filed in support and opposition, on hearing the arguments of plaintiff and counsel, and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

        RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

        Plaintiff was employed by non-party Golden Gate Bridge Highway and Transportation District ("Golden Gate") as an Electronic Technician Mechanic from October 1999 to November 2004. Second Amend. Compl. ("SAC") at 9, 25. In anticipation of his

1  retirement, plaintiff sought advice from defendant CalPERS[1] as to the earliest date he could
2  retire with at least five years of service so as to be eligible to purchase Additional Retirement
3  Service Credit ("ARSC").[2] Id. at 2-3.  He claims defendant's agent told him he would have five
4  years of service to Golden Gate in the first week of November 2004.  Id. at 2.  In reliance on the
5  information, plaintiff elected to retire on November 22, 2004.  Id.

6          On April 14, 2004, more than seven months before his November 22, 2004
7  retirement date, plaintiff filed an application with CalPERS to purchase ARSC.  SAC at 4.  By
8  letter dated February 7, 2005, defendant informed plaintiff that he was ineligible for ARSC
9  because he had less than 5 years of "earned service credit."  Id. at 15.  While plaintiff does not
10 dispute that he lacked five years of service credit at the time he filed his application to purchase
11 ARSC, he argues that he did in fact have sufficient service credit to qualify for the program as of
12 the date of defendant's letter of ineligibility.  Id. at 2.

13         Plaintiff apparently took no action to investigate his eligibility for the ARSC
14 program until over five years later when, on June 9, 2010, he contacted the Governor's Office
15 regarding defendant's February 7, 2005 denial of his application to purchase ARSC.  SAC at 3.
16 In response to an investigation initiated by the Governor's Office, defendant advised plaintiff by
17 letter dated June 14, 2010 that his application to purchase ARSC was denied because eligibility
18 for ARSC is determined as of the date that an application is received, not the date when an
19 application is considered.  In plaintiff's case, his application was received on April 14, 2004,
20 many months before his November 2004 eligibility date.  Based on this information, defendant

---

[1] Plaintiff fails to explain that Golden Gate contracted with defendant CalPERS to manage retirement benefits for Golden Gate's employees.  See Def.'s Mot. J. Pleadings at 5.

[2] A 2010 letter from CalPERS included in plaintiff's complaint explains that the ARSC program "allowed CalPERS members the option to purchase additional service credit between one and five years, to enhance their retirement benefits."  SAC at 16.  The program's only two eligibility requirements were "being in compensated employment with a CalPERS covered employer, and having 5.000 years of plan participation with the CalPERS system at the time the ARSC request is received."  Id.

informed plaintiff that he should have waited until November 2004 to submit his ARSC application. Id. at 4, 16.

On July 14, 2010, defendant sent plaintiff another letter stating that its determination of plaintiff's eligibility for ARSC was affected by late payroll reporting from Golden Gate. SAC at 3, 17. In finding that plaintiff was indeed eligible for ARSC, CalPERS gave plaintiff the option to purchase the additional five years of service credit. Id. at 5.

When plaintiff exercised the option to purchase the service credit, he claims the $38,394.63 purchase cost the defendant initially quoted was increased to $64,697.05. SAC at 5.

On August 29, 2010, plaintiff filed a Title VII employment discrimination charge on the basis of national origin against defendant with the U.S. Equal Employment Opportunity Commission ("EEOC"). SAC at 1. The EEOC found no evidence of discrimination on the basis of national origin, and sent plaintiff a form entitled Dismissal and Notice of Rights on February 24, 2011. Id. at 1, 31-33.

On April 5, 2011, plaintiff initiated suit in this court. Following the court's screening and dismissal of the original complaint, plaintiff filed a first amended complaint on July 20, 2011. This pleading was also dismissed with leave to amend. ECF 9. In that order, the court informed plaintiff that he would have "one last opportunity to amend." Id. at 4.

Plaintiff's second amended complaint, filed on October 11, 2011, is the operative complaint in this case. The SAC alleges that defendant's 2005 denial of plaintiff's application to purchase ARSC constitutes discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2 (West 2012). Plaintiff asserts that his Middle Eastern accent and last name gave defendant "an excuse for singling [him] out." Although plaintiff's complaint does not set forth causes of action as such, liberally construed it can also be read to allege claims of retaliation under Title VII, negligence, and breach of contract. Plaintiff seeks $44,000 in compensatory damages and $100,000 in punitive damages. The compensatory damages alleged include interest on defendant's delayed higher monthly

3

pension payments and the interest payments defendant has charged plaintiff to finance the ARSC purchase.

Defendant filed an answer on May 15, 2012, offering eight affirmative defenses. On January 10, 2013, defendant filed a motion for judgment on the pleadings, which plaintiff opposes.

## LEGAL STANDARDS

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." Merchs. Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc., 50 F.3d 1486, 1488 (9th Cir. 1995). "Because it is only after the pleadings are closed that the motion for judgment on the pleadings is authorized (Rule 12(c)), Rule 12(h)(2) should be read as allowing a motion for judgment on the pleadings, raising the defense of failure to state a claim, even after an answer has been filed." Aldabe v. Aldabe, 616 F.2d 1089, 1093 (9th Cir. 1980).

Here, although defendant previously filed an answer, it is not precluded from raising as a defense plaintiff's failure to state a claim on which relief can be granted in its motion for judgment on the pleadings. See Aldabe, 616 F.2d at 1093. This conclusion is strengthened by defendant's having raised this defense in its answer as well. See id.

## DISCUSSION

Defendant's motion raises, inter alia, the following arguments for judgment on the pleadings: (1) defendant was not plaintiff's employer, (2) plaintiff failed to establish a prima facie case under Title VII, and (3) state sovereign immunity deprives this court of jurisdiction over plaintiff's common law or state law claims. The court shall examine each of these arguments below.

////

A.  Title VII

    i.  Third Party as Employer Under Title VII

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C.A. § 2000e-2. Defendant argues that plaintiff cannot meet this requirement because Golden Gate, not defendant CalPERS, was his employer.

However, "[a] direct employment relationship is not a prerequisite to Title VII liability. Although 'there must be some connection with an employment relationship for Title VII protections to apply,' that 'connection with employment need not necessarily be direct.'" Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572, 580 (9th Cir. 2000) (quoting Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir. 1980)). There are three relevant legal theories under which the conduct of an entity that is not an employee's direct employer could nonetheless result in Title VII liability: (1) integrated enterprise, (2) joint employers, and (3) agency theory. See, e.g., DaOro v. Eskaton, 2013 WL 789120, at *4-6 (E.D. Cal. Mar. 1, 2013) (examining whether defendant can be deemed plaintiff's employer under Title VII based on any of these three theories).

    a.  Integrated Enterprise

The Ninth Circuit employs a four-factor test to assess whether two entities should be viewed as an integrated enterprise. Kang v. U. Lim Am., Inc., 296 F.3d 810, 815 (9th Cir. 2002). It looks to whether they have (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. Id. Here, both CalPERS and Golden Gate have a distinct operational focus and a separate governing board, are solely responsible for hiring and managing their own personnel; and receive their own funding from different sources. Thus, application of the four-factor test to Golden Gate and CalPERS shows that the two agencies are not an integrated enterprise.

5

b.  Joint Employers

Next, "[t]wo or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee." E.E.O.C. v. Pac. Mar. Ass'n, 351 F.3d 1270, 1275 (9th Cir. 2003). In this case, neither entity has control over the other's hiring and retention of personnel. Each agency is individually responsible for setting the terms and conditions of employment for its staff. As such, Golden Gate and CalPERS cannot be seen as joint employers.

c.  Agency Theory

Finally, employers and third parties may be liable under Title VII on an agency theory. Morgan v. Safeway Stores, Inc., 884 F.2d 1211, 1214 (9th Cir. 1989). Generally, Title VII defines the term "employer" to include "a person engaged in an industry affecting commerce who has fifteen or more employees…and any agent of such a person." 42 U.S.C.A. § 2000e(b) (West 2013) (emphasis added). A finding of agency requires the actual employer to be "more than a broker"; "the employer must affirmatively, actively participate in the third-party program." Morgan, 884 F.2d at 1214.

The specific question before the court – whether a third party can be liable under Title VII for the discriminatory conduct of its own employees – has not been directly addressed by the Ninth Circuit. In a somewhat related context – that of facially discriminatory benefit plans – the Supreme Court has established that "an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of race, religion, sex, or national origin violates Title VII regardless of whether third parties are also involved in the discrimination." Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris, 463 U.S. 1073, 1089 (1983). In Norris, the Supreme Court found that employees may bring suit against their public employer for the facially-discriminatory benefit plan provided by a third party because "the State of Arizona was itself a party to contracts concerning the annuities to be offered by the insurance companies, and it is well established that both parties to a

6

discriminatory contract are liable for any discriminatory provisions the contract contains, regardless of which party initially suggested inclusion of the discriminatory provisions." Id. at 1090.

Case law also suggests that a third-party provider of a facially discriminatory employee benefits plan can be held liable as employers under Title VII. See Spirt v. Teachers Ins. & Annuity Ass'n, 691 F.2d 1054, 1057 (2d Cir. 1982), vacated sub nom. Long Island Univ. v. Spirt, 463 U.S. 1223 (1983). In Spirt, plaintiff's employer had contracted with third-party entities, TIAA and CREF, to manage retirement plans for its employees. These plans paid women a lower monthly benefit than men for the same amount in contributions. Id. at 1058. The court held that, for purposes of Title VII, defendants should be "deemed" plaintiff's employer since they exist "solely for the purpose of enabling universities to delegate their responsibility to provide retirement benefits for their employees." Id. at 1063. The Ninth Circuit has endorsed a similar view of Title VII agent liability in dicta, observing that: "We and the Second Circuit have held that trusts established by a single employer are treated as employers for Title VII purposes." Lee v. Cal. Butchers' Pension Trust Fund, 154 F.3d 1075, 1079 (9th Cir. 1998).

In these cited cases, the question before the courts was the extent of the liability, if any, under Title VII of an employer and/or a third party provider in the context of a facially-discriminatory benefits plan. In this case, the question differs in that the court is asked to consider whether a third party may be liable under Title VII for the allegedly discriminatory conduct of its employee(s), not its facially-discriminatory benefits policy. This appears to be a question of first impression. For the reasons set forth below, the court does not find it necessary to reach this question because defendant's motion can be decided on other grounds.

    ii.    <u>Plaintiff Has Failed to Allege a Prima Facie Case Under Title VII</u>

Defendant next seeks judgment on the pleadings on the ground that plaintiff fails to state a prima facie case under Title VII. To establish a prima facie case of discrimination

under Title VII, the plaintiff must show: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Bodett v. CoxCom, Inc., 366 F.3d 736, 743 (9th Cir. 2004). "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." Ricci v. DeStefano, 557 U.S. 557, 577 (2009). "Proof of discriminatory motive is critical [in disparate treatment cases], although it can in some situations be inferred from the mere fact of differences in treatment." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

Based upon his factual allegations, plaintiff here is clearly asserting a disparate treatment claim. On review, the court finds that, even assuming plaintiff met the first three factors identified in Bodett, his failure to adequately allege the fourth factor is fatal to his Title VII claim. Plaintiff appears to allege that he was subjected to disparate treatment because he is Iranian. He claims his Middle Eastern accent and last name "gave CALPERS an excuse for singling [him] out" for a "malicious act of discrimination." The alleged acts of discrimination consisted of defendant's initial denial of plaintiff's eligibility to make the ARSC purchase and its subsequent misinformation regarding his eligibility and the purchase price of ARSC. Plaintiff argues that defendant's conduct can only be explained by discriminatory animus.

None of these circumstances, however, give rise to an inference of discrimination against plaintiff. See Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1112 (9th Cir. 1991), superseded by statute on other grounds as recognized in Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1041 (9th Cir. 2005). In Sischo-Nownejad, a female professor alleged that her all male colleagues assigned her to courses she did not want to teach, monitored the enrollment of her courses (but no one else's), and failed to provide her with needed supplies.

1  During the same time frame, her superiors spoke of her as an "old war horse" and described her
2  students as "little old ladies." Id.  The Ninth Circuit found that the employer's use of
3  stereotyped remarks reflecting sex and age bias, alongside the employer's "subjecting [plaintiff]
4  to less favorable working conditions" than those enjoyed by her male colleagues, gave rise to "an
5  inference of discriminatory intent." Id.

6  Unlike in Sischo-Nownejad, where the plaintiff was subjected to stereotyped
7  remarks and inferior working conditions compared to those of her male colleagues, plaintiff here
8  has pointed to no direct or circumstantial evidence suggesting that defendant's representatives
9  singled him out for unfavorable treatment on the basis of his national origin.  See
10 Sischo-Nownejad, 934 F.2d at 1112.  His subjective belief that defendant's agents intentionally
11 misrepresented his eligibility for the ARSC program because they identified his accent and last
12 name as being Iranian and sought to discriminate against him based on his national origin is
13 entirely speculative.  See, e.g., Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1459 (9th Cir.
14 1985) ("Mere assertions of discriminatory motive and intent . . . are inadequate."), overruled on
15 other grounds by Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262 (9th Cir. 1991); Ray v. Tandem
16 Computers, Inc., 63 F.3d 429, 434 (5th Cir. 1995) (finding employee's subjective belief of
17 discriminatory intent insufficient "to establish a material question of fact" regarding the
18 employer's motives).

19 Since plaintiff has alleged no conduct by defendant giving rise to an inference of
20 unlawful discrimination, he has failed to establish a prima facie case for employment
21 discrimination under Title VII.  Accordingly, defendant's motion should be granted on this
22 ground.

23     iii.    Plaintiff Has Failed to Allege Retaliation Under Title VII

24 Plaintiff's pleading can also be construed to state a Title VII retaliation claim.
25 Title VII provides that "[i]t shall be an unlawful employment practice for an employer to
26 discriminate against any of his employees . . . because [that employee] has opposed any practice

9

made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C.A. § 2000e-3(a).  A plaintiff establishes "a prima facie case of retaliation by showing that she engaged in a protected activity, that she was thereafter subjected by her employer to adverse employment action, and that a causal link exists between the two." Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).  Protected activity encompasses participation in enforcing one's rights under Title VII or opposition to an employer's discriminatory conduct under Title VII.  Learned v. City of Bellevue, 860 F.2d 928, 932-33 (9th Cir. 1988).

Plaintiff alleges defendant retaliated against him without specifying his protected conduct.  The adverse employment action plaintiff complains of is the wrongful deprivation of his right to supplement his pension benefits by purchasing ARSC.  Plaintiff fails to allege that he engaged in any protected activity before defendant took this adverse action.  Plaintiff did eventually engage in protected activity by filing an EEOC complaint.  Id. at 1.  However, the entirety of defendant's allegedly adverse employment actions predated plaintiff's participation in enforcing his rights under Title VII.  Because plaintiff never alleges that his engagement in protected activity caused defendant to take adverse employment action in retaliation, he has failed to allege retaliation under Title VII.

To the extent plaintiff contends that defendant retaliated against him for complaining about defendant's failure to deliver his pension checks in a timely fashion, see SAC at 4, those complaints do not qualify as protected activity because they did not involve plaintiff's participation in enforcing his rights under Title VII.  Plaintiff could not reasonably have believed that defendant's alleged failure to mail his pension checks on time constituted unlawful discrimination in violation of Title VII.  See Learned, 860 F.2d at 932-33.  As such, even if defendant retaliated against plaintiff on this basis, defendant has not violated the anti-retaliation provisions of Title VII.

B.     State Law Claims

Having found that plaintiff's Title VII claims should be dismissed, the court recommends against the exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any state law claims (e.g., negligence and breach of contract) the complaint may allege when liberally construed.

Although plaintiff has not alleged diversity jurisdiction in his complaint, the court does note that he is presently in New York and that CalPERS is a California-based entity. Additionally, plaintiff has alleged more than $75,000 in damages. SAC at 5. Thus, assuming the existence of diversity jurisdiction, the court would nonetheless recommend the dismissal of plaintiff's state law claims pursuant to the Eleventh Amendment.

"Under the [E]leventh [A]mendment, agencies of the state are immune from private damage actions or suits for injunctive relief brought in federal court." Mitchell v. L.A. Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1988). Congress may abrogate states' sovereign immunity from suit through an express statement of its intent to abrogate and "pursuant to a valid grant of constitutional authority." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000). "Section 5 of the Fourteenth Amendment empowers Congress to 'enforce, by appropriate legislation, the provisions of' that article, and state sovereign immunity may be abrogated in service of this goal." Alaska v. EEOC, 564 F.3d 1062, 1067 (9th Cir. 2009).

"[T]he Supreme Court has been cautious in extending state sovereign immunity even to many state-created and quasi-governmental entities." Del Campo v. Kennedy, 517 F.3d 1070, 1075 (9th Cir. 2008). "The usual issue . . . has been whether a governmental entity is an arm of the state or is better characterized as part of another level of government." Id. at 1076. "To determine whether a governmental agency is an arm of the state, the following factors must be examined: whether a money judgment would be satisfied out of state funds, whether the entity performs central governmental functions, whether the entity may sue or be sued, whether the entity has the power to take property in its own name or only the name of the state, and the corporate status of the entity." Mitchell, 861 F.2d at 201.

11

Since there is no constitutional authority for abrogation of state sovereign immunity with respect to negligence and breach of contract claims, this court lacks jurisdiction over any such claims if defendant CalPERS qualifies as an arm of the state. See Kimel, 528 U.S. at 73. The Ninth Circuit has not yet addressed CalPERS' status under the Eleventh Amendment. However, a number of California district courts have concluded that CalPERS is in fact an arm of the state. See, e.g., Barroga v. Bd. of Admin. Cal. Pub. Emps.' Ret. Sys., 2012 WL 5337326, at *5 (E.D. Cal. Oct. 26, 2012); Cal. Pub. Emps. Ret. Sys. v. Moody's Corp., 2009 WL 3809816, at *6 (N.D. Cal. Nov. 10, 2009).

In Moody's Corp., the court evaluated CalPERS based on the factors identified in Mitchell. Moody's Corp., 2009 WL 3809816, at *3-6; see Mitchell, 861 F.2d at 201. The court noted that although CalPERS could sue, be sued, and take property in its own name, it lacked corporate status, and it performed central governmental functions. Moody's Corp., 2009 WL 3809816, at *4-6. The court also observed that the state legislature was legally obligated to backfill any shortfalls in CalPERS' ability to pay out vested pension benefits to state workers. Id. at *3-4. On balance, the court found these factors cut in favor of viewing CalPERS as an arm of the state. Id. at *6. The court's reasoning is persuasive and should be applied to the present case as well.

Since CalPERS, as an arm of the state, benefits from sovereign immunity under the Eleventh Amendment, this court lacks subject matter jurisdiction over any state law claims alleged by plaintiff.

C.      Leave to Amend

"Under Ninth Circuit case law, district courts are only required to grant leave to amend if a complaint can possibly be saved. Courts are not required to grant leave to amend if a complaint lacks merit entirely." Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000); see also Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1106 (9th Cir. 2004) (citing Doe v. United States, 58 F.3d 494, 497(9th Cir. 1995) ("a district court should grant leave to amend even if no

request to amend the pleading was made, unless it determines that the pleading could not be cured by the allegation of other facts.")). "[A] district court retains its discretion over the terms of a dismissal for failure to state a claim, including whether to make the dismissal with or without leave to amend." Lopez, 203 F.3d at 1124. "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1072 (9th Cir. 2008) (quoting In re Read-Rite Corp., 335 F.3d 843, 845 (9th Cir. 2003)).

In deciding whether to grant leave to amend, the court finds that, liberally construed, plaintiff's SAC could be read to allege a § 1983 claim for denial of equal protection under the Fourteenth Amendment. However, because "[a] plaintiff who fails to establish intentional discrimination for purposes of Title VII … also fails to establish intentional discrimination for purposes of § 1983," the court finds that plaintiff has failed to state a claim under 42 U.S.C § 1983. See Sischo-Nownejad, 934 F.2d at 1112.

On review, then, the court finds that dismissal of plaintiff's complaint without leave to amend is appropriate for the following reasons. First, the court advised plaintiff in its order dismissing plaintiff's amended complaint that he would "be given one last opportunity to amend his complaint." ECF No. 9 at 4. Second, the court asked plaintiff at the April 10, 2013 hearing on defendant's motion for judgment on the pleadings whether he was aware of any additional facts suggesting defendant had subjected him to discriminatory treatment based on his national origin. He said there were no additional facts to add. Finally, plaintiff stated in his opposition to defendant's motion that "there is no need for an amendment." Pl.'s Opp'n to Def.'s Mot. J. Pleadings 12:25. On these grounds, the court finds that further amendment would be futile.

Accordingly, IT IS THEREFORE RECOMMENDED that:

1. Defendant's motion for judgment on the pleadings be granted with respect to plaintiff's Title VII and § 1983 claims;

13

2. Plaintiff's state law claims—negligence and breach of contract—be dismissed without prejudice for lack of subject matter jurisdiction; and

3. The Clerk be directed to enter judgment in defendant's favor.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven (7) days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 1, 2013.

*[signature]*

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

/mb;arya1354.mjop