1
2
3
4
5
6
7                         IN THE UNITED STATES DISTRICT COURT

8                       FOR THE EASTERN DISTRICT OF CALIFORNIA

9
10
11   KEVAN ARYA,

12              Plaintiff,                     No. 2:11-CV-1354 GEB AC PS

13         vs.

14   CALPERS,

15              Defendant.                     <u>FINDINGS & RECOMMENDATIONS</u>

16   _____/

17              On April 10, 2013, the court held a hearing on defendant California Public

18   Employees' Retirement System's ("CalPERS") motion for judgment on the pleadings pursuant

19   to Federal Rule of Civil Procedure 12(c).  Plaintiff Kevan Arya appeared in pro per.  D. Greg

20   Valenza appeared for defendant.  On review of the motion, the documents filed in support and

21   opposition, on hearing the arguments of plaintiff and counsel, and good cause appearing therefor,

22   THE COURT FINDS AS FOLLOWS:

23                     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

24              Plaintiff was employed by non-party Golden Gate Bridge Highway and

25   Transportation District ("Golden Gate") as an Electronic Technician Mechanic from October

26   1999 to November 2004.  Second Amend. Compl. ("SAC") at 9, 25.  In anticipation of his

                                             1

1  retirement, plaintiff sought advice from defendant CalPERS[1] as to the earliest date he could

2  retire with at least five years of service so as to be eligible to purchase Additional Retirement

3  Service Credit ("ARSC").[2]  Id. at 2-3.  He claims defendant's agent told him he would have five

4  years of service to Golden Gate in the first week of November 2004.  Id. at 2.  In reliance on the

5  information, plaintiff elected to retire on November 22, 2004.  Id.

6          On April 14, 2004, more than seven months before his November 22, 2004

7  retirement date, plaintiff filed an application with CalPERS to purchase ARSC.  SAC at 4.  By

8  letter dated February 7, 2005, defendant informed plaintiff that he was ineligible for ARSC

9  because he had less than 5 years of "earned service credit."  Id. at 15.  While plaintiff does not

10  dispute that he lacked five years of service credit at the time he filed his application to purchase

11  ARSC, he argues that he did in fact have sufficient service credit to qualify for the program as of

12  the date of defendant's letter of ineligibility.  Id. at 2.

13          Plaintiff apparently took no action to investigate his eligibility for the ARSC

14  program until over five years later when, on June 9, 2010, he contacted the Governor's Office

15  regarding defendant's February 7, 2005 denial of his application to purchase ARSC.  SAC at 3.

16  In response to an investigation initiated by the Governor's Office, defendant advised plaintiff by

17  letter dated June 14, 2010 that his application to purchase ARSC was denied because eligibility

18  for ARSC is determined as of the date that an application is received, not the date when an

19  application is considered.  In plaintiff's case, his application was received on April 14, 2004,

20  many months before his November 2004 eligibility date.  Based on this information, defendant

21

22          [1] Plaintiff fails to explain that Golden Gate contracted with defendant CalPERS to
manage retirement benefits for Golden Gate's employees.  See Def.'s Mot. J. Pleadings at 5.

23

24          [2] A 2010 letter from CalPERS included in plaintiff's complaint explains that the ARSC
program "allowed CalPERS members the option to purchase additional service credit between
25  one and five years, to enhance their retirement benefits."  SAC at 16.  The program's only two
eligibility requirements were "being in compensated employment with a CalPERS covered
employer, and having 5.000 years of plan participation with the CalPERS system at the time the
26  ARSC request is received."  Id.

1    informed plaintiff that he should have waited until November 2004 to submit his ARSC

2    application.  Id. at 4, 16.

3           On July 14, 2010, defendant sent plaintiff another letter stating that its

4    determination of plaintiff's eligibility for ARSC was affected by late payroll reporting from

5    Golden Gate.  SAC at 3, 17.  In finding that plaintiff was indeed eligible for ARSC, CalPERS

6    gave plaintiff the option to purchase the additional five years of service credit.  Id. at 5.

7           When plaintiff exercised the option to purchase the service credit, he claims the

8    $38,394.63 purchase cost the defendant initially quoted was increased to $64,697.05.  SAC at 5.

9           On August 29, 2010, plaintiff filed a Title VII employment discrimination charge

10   on the basis of national origin against defendant with the U.S. Equal Employment Opportunity

11   Commission ("EEOC").  SAC at 1.  The EEOC found no evidence of discrimination on the basis

12   of national origin, and sent plaintiff a form entitled Dismissal and Notice of Rights on February

13   24, 2011.  Id. at 1, 31-33.

14          On April 5, 2011, plaintiff initiated suit in this court.  Following the court's

15   screening and dismissal of the original complaint, plaintiff filed a first amended complaint on

16   July 20, 2011.  This pleading was also dismissed with leave to amend.  ECF 9.  In that order, the

17   court informed plaintiff that he would have "one last opportunity to amend."  Id. at 4.

18          Plaintiff's second amended complaint, filed on October 11, 2011, is the operative

19   complaint in this case.  The SAC alleges that defendant's 2005 denial of plaintiff's application to

20   purchase ARSC constitutes discrimination on the basis of national origin in violation of Title VII

21   of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2 (West 2012).  Plaintiff asserts that his

22   Middle Eastern accent and last name gave defendant "an excuse for singling [him] out."

23   Although plaintiff's complaint does not set forth causes of action as such, liberally construed it

24   can also be read to allege claims of retaliation under Title VII, negligence, and breach of

25   contract.  Plaintiff seeks $44,000 in compensatory damages and $100,000 in punitive damages.

26   The compensatory damages alleged include interest on defendant's delayed higher monthly

3

1  pension payments and the interest payments defendant has charged plaintiff to finance the ARSC

2  purchase.

3  Defendant filed an answer on May 15, 2012, offering eight affirmative defenses.

4  On January 10, 2013, defendant filed a motion for judgment on the pleadings, which plaintiff

5  opposes.

6  LEGAL STANDARDS

7  "After the pleadings are closed—but early enough not to delay trial—a party may

8  move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is

9  properly granted when, taking all allegations in the pleading as true, the moving party is entitled

10  to judgment as a matter of law." Merchs. Home Delivery Serv., Inc. v. Frank B. Hall & Co.,

11  Inc., 50 F.3d 1486, 1488 (9th Cir. 1995). "Because it is only after the pleadings are closed that

12  the motion for judgment on the pleadings is authorized (Rule 12(c)), Rule 12(h)(2) should be

13  read as allowing a motion for judgment on the pleadings, raising the defense of failure to state a

14  claim, even after an answer has been filed." Aldabe v. Aldabe, 616 F.2d 1089, 1093 (9th Cir.

15  1980).

16  Here, although defendant previously filed an answer, it is not precluded from

17  raising as a defense plaintiff's failure to state a claim on which relief can be granted in its motion

18  for judgment on the pleadings. See Aldabe, 616 F.2d at 1093. This conclusion is strengthened

19  by defendant's having raised this defense in its answer as well. See id.

20  DISCUSSION

21  Defendant's motion raises, inter alia, the following arguments for judgment on the

22  pleadings: (1) defendant was not plaintiff's employer, (2) plaintiff failed to establish a prima

23  facie case under Title VII, and (3) state sovereign immunity deprives this court of jurisdiction

24  over plaintiff's common law or state law claims. The court shall examine each of these

25  arguments below.

26  ////

1  A.    Title VII

2        i.    Third Party as Employer Under Title VII

3              Title VII makes it unlawful for an employer "to discriminate against any

4  individual with respect to his compensation, terms, conditions, or privileges of employment,

5  because of such individual's . . . national origin." 42 U.S.C.A. § 2000e-2.  Defendant argues that

6  plaintiff cannot meet this requirement because Golden Gate, not defendant CalPERS, was his

7  employer.

8              However, "[a] direct employment relationship is not a prerequisite to Title VII

9  liability.  Although 'there must be some connection with an employment relationship for Title

10 VII protections to apply,' that 'connection with employment need not necessarily be direct.'"

11 Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572, 580 (9th Cir. 2000) (quoting

12 Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir. 1980)).  There are three

13 relevant legal theories under which the conduct of an entity that is not an employee's direct

14 employer could nonetheless result in Title VII liability: (1) integrated enterprise, (2) joint

15 employers, and (3) agency theory.  See, e.g., DaOro v. Eskaton, 2013 WL 789120, at *4-6 (E.D.

16 Cal. Mar. 1, 2013) (examining whether defendant can be deemed plaintiff's employer under Title

17 VII based on any of these three theories).

18        a.    Integrated Enterprise

19             The Ninth Circuit employs a four-factor test to assess whether two entities should

20 be viewed as an integrated enterprise.  Kang v. U. Lim Am., Inc., 296 F.3d 810, 815 (9th Cir.

21 2002).  It looks to whether they have (1) interrelated operations, (2) common management, (3)

22 centralized control of labor relations, and (4) common ownership or financial control.  Id.  Here,

23 both CalPERS and Golden Gate have a distinct operational focus and a separate governing

24 board, are solely responsible for hiring and managing their own personnel; and receive their own

25 funding from different sources.  Thus, application of the four-factor test to Golden Gate and

26 CalPERS shows that the two agencies are not an integrated enterprise.

1          b.     <u>Joint Employers</u>

2          Next, "[t]wo or more employers may be considered 'joint employers' if both

3 employers control the terms and conditions of employment of the employee." <u>E.E.O.C. v. Pac.</u>

4 <u>Mar. Ass'n</u>, 351 F.3d 1270, 1275 (9th Cir. 2003).  In this case, neither entity has control over the

5 other's hiring and retention of personnel.  Each agency is individually responsible for setting the

6 terms and conditions of employment for its staff.  As such, Golden Gate and CalPERS cannot be

7 seen as joint employers.

8          c.     <u>Agency Theory</u>

9          Finally, employers and third parties may be liable under Title VII on an agency

10 theory. <u>Morgan v. Safeway Stores, Inc.</u>, 884 F.2d 1211, 1214 (9th Cir. 1989).  Generally, Title

11 VII defines the term "employer" to include "a person engaged in an industry affecting commerce

12 who has fifteen or more employees…and any agent of such a person."  42 U.S.C.A. § 2000e(b)

13 (West 2013) (emphasis added).  A finding of agency requires the actual employer to be "more

14 than a broker"; "the employer must affirmatively, actively participate in the third-party

15 program." <u>Morgan</u>, 884 F.2d at 1214.

16          The specific question before the court – whether a third party can be liable under

17 Title VII for the discriminatory conduct of its own employees – has not been directly addressed

18 by the Ninth Circuit.  In a somewhat related context – that of facially discriminatory benefit

19 plans – the Supreme Court has established that "an employer that adopts a fringe-benefit scheme

20 that discriminates among its employees on the basis of race, religion, sex, or national origin

21 violates Title VII regardless of whether third parties are also involved in the discrimination."

22 <u>Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris</u>, 463 U.S.

23 1073, 1089 (1983).  In <u>Norris</u>, the Supreme Court found that employees may bring suit against

24 their public employer for the facially-discriminatory benefit plan provided by a third party

25 because "the State of Arizona was itself a party to contracts concerning the annuities to be

26 offered by the insurance companies, and it is well established that both parties to a

1  discriminatory contract are liable for any discriminatory provisions the contract contains,

2  regardless of which party initially suggested inclusion of the discriminatory provisions." Id. at

3  1090.

4  　　　　　Case law also suggests that a third-party provider of a facially discriminatory

5  employee benefits plan can be held liable as employers under Title VII. See Spirt v. Teachers

6  Ins. & Annuity Ass'n, 691 F.2d 1054, 1057 (2d Cir. 1982), vacated sub nom. Long Island Univ.

7  v. Spirt, 463 U.S. 1223 (1983). In Spirt, plaintiff's employer had contracted with third-party

8  entities, TIAA and CREF, to manage retirement plans for its employees. These plans paid

9  women a lower monthly benefit than men for the same amount in contributions. Id. at 1058.

10  The court held that, for purposes of Title VII, defendants should be "deemed" plaintiff's

11  employer since they exist "solely for the purpose of enabling universities to delegate their

12  responsibility to provide retirement benefits for their employees." Id. at 1063. The Ninth Circuit

13  has endorsed a similar view of Title VII agent liability in dicta, observing that: "We and the

14  Second Circuit have held that trusts established by a single employer are treated as employers for

15  Title VII purposes." Lee v. Cal. Butchers' Pension Trust Fund, 154 F.3d 1075, 1079 (9th Cir.

16  1998).

17  　　　　　In these cited cases, the question before the courts was the extent of the liability,

18  if any, under Title VII of an employer and/or a third party provider in the context of a

19  facially-discriminatory benefits plan. In this case, the question differs in that the court is asked

20  to consider whether a third party may be liable under Title VII for the allegedly discriminatory

21  conduct of its employee(s), not its facially-discriminatory benefits policy. This appears to be a

22  question of first impression. For the reasons set forth below, the court does not find it necessary

23  to reach this question because defendant's motion can be decided on other grounds.

24  　　　ii.　　Plaintiff Has Failed to Allege a Prima Facie Case Under Title VII

25  　　　　　Defendant next seeks judgment on the pleadings on the ground that plaintiff fails

26  to state a prima facie case under Title VII. To establish a prima facie case of discrimination

1   under Title VII, the plaintiff must show: "(1) [s]he is a member of a protected class; (2) [s]he

2   was qualified for [her] position; (3) [s]he experienced an adverse employment action; and (4)

3   similarly situated individuals outside [her] protected class were treated more favorably, or other

4   circumstances surrounding the adverse employment action give rise to an inference of

5   discrimination." Bodett v. CoxCom, Inc., 366 F.3d 736, 743 (9th Cir. 2004). "Title VII

6   prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some

7   cases, practices that are not intended to discriminate but in fact have a disproportionately adverse

8   effect on minorities (known as 'disparate impact')." Ricci v. DeStefano, 557 U.S. 557, 577

9   (2009). "Proof of discriminatory motive is critical [in disparate treatment cases], although it can

10   in some situations be inferred from the mere fact of differences in treatment." Int'l Bhd. of

11   Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

12        Based upon his factual allegations, plaintiff here is clearly asserting a disparate

13   treatment claim. On review, the court finds that, even assuming plaintiff met the first three

14   factors identified in Bodett, his failure to adequately allege the fourth factor is fatal to his Title

15   VII claim. Plaintiff appears to allege that he was subjected to disparate treatment because he is

16   Iranian. He claims his Middle Eastern accent and last name "gave CALPERS an excuse for

17   singling [him] out" for a "malicious act of discrimination." The alleged acts of discrimination

18   consisted of defendant's initial denial of plaintiff's eligibility to make the ARSC purchase and its

19   subsequent misinformation regarding his eligibility and the purchase price of ARSC. Plaintiff

20   argues that defendant's conduct can only be explained by discriminatory animus.

21        None of these circumstances, however, give rise to an inference of discrimination

22   against plaintiff. See Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1112 (9th

23   Cir. 1991), superseded by statute on other grounds as recognized in Dominguez-Curry v. Nevada

24   Transp. Dep't, 424 F.3d 1027, 1041 (9th Cir. 2005). In Sischo-Nownejad, a female professor

25   alleged that her all male colleagues assigned her to courses she did not want to teach, monitored

26   the enrollment of her courses (but no one else's), and failed to provide her with needed supplies.

1    During the same time frame, her superiors spoke of her as an "old war horse" and described her

2    students as "little old ladies."  Id.  The Ninth Circuit found that the employer's use of

3    stereotyped remarks reflecting sex and age bias, alongside the employer's "subjecting [plaintiff]

4    to less favorable working conditions" than those enjoyed by her male colleagues, gave rise to "an

5    inference of discriminatory intent."  Id.

6          Unlike in Sischo-Nownejad, where the plaintiff was subjected to stereotyped

7    remarks and inferior working conditions compared to those of her male colleagues, plaintiff here

8    has pointed to no direct or circumstantial evidence suggesting that defendant's representatives

9    singled him out for unfavorable treatment on the basis of his national origin.  See

10   Sischo-Nownejad, 934 F.2d at 1112.  His subjective belief that defendant's agents intentionally

11   misrepresented his eligibility for the ARSC program because they identified his accent and last

12   name as being Iranian and sought to discriminate against him based on his national origin is

13   entirely speculative.  See, e.g., Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1459 (9th Cir.

14   1985) ("Mere assertions of discriminatory motive and intent . . . are inadequate."), overruled on

15   other grounds by Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262 (9th Cir. 1991); Ray v. Tandem

16   Computers, Inc., 63 F.3d 429, 434 (5th Cir. 1995) (finding employee's subjective belief of

17   discriminatory intent insufficient "to establish a material question of fact" regarding the

18   employer's motives).

19          Since plaintiff has alleged no conduct by defendant giving rise to an inference of

20   unlawful discrimination, he has failed to establish a prima facie case for employment

21   discrimination under Title VII.  Accordingly, defendant's motion should be granted on this

22   ground.

23          iii.    Plaintiff Has Failed to Allege Retaliation Under Title VII

24          Plaintiff's pleading can also be construed to state a Title VII retaliation claim.

25   Title VII provides that "[i]t shall be an unlawful employment practice for an employer to

26   discriminate against any of his employees . . . because [that employee] has opposed any practice

9

1   made an unlawful employment practice by this subchapter, or because he has made a charge . . .

2   under this subchapter." 42 U.S.C.A. § 2000e-3(a).  A plaintiff establishes "a prima facie case of

3   retaliation by showing that she engaged in a protected activity, that she was thereafter subjected

4   by her employer to adverse employment action, and that a causal link exists between the two."

5   Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).  Protected activity encompasses

6   participation in enforcing one's rights under Title VII or opposition to an employer's

7   discriminatory conduct under Title VII.  Learned v. City of Bellevue, 860 F.2d 928, 932-33 (9th

8   Cir. 1988).

9           Plaintiff alleges defendant retaliated against him without specifying his protected

10   conduct.  The adverse employment action plaintiff complains of is the wrongful deprivation of

11   his right to supplement his pension benefits by purchasing ARSC.  Plaintiff fails to allege that he

12   engaged in any protected activity before defendant took this adverse action.  Plaintiff did

13   eventually engage in protected activity by filing an EEOC complaint. Id. at 1.  However, the

14   entirety of defendant's allegedly adverse employment actions predated plaintiff's participation in

15   enforcing his rights under Title VII.  Because plaintiff never alleges that his engagement in

16   protected activity caused defendant to take adverse employment action in retaliation, he has

17   failed to allege retaliation under Title VII.

18           To the extent plaintiff contends that defendant retaliated against him for

19   complaining about defendant's failure to deliver his pension checks in a timely fashion, see SAC

20   at 4, those complaints do not qualify as protected activity because they did not involve plaintiff's

21   participation in enforcing his rights under Title VII.  Plaintiff could not reasonably have believed

22   that defendant's alleged failure to mail his pension checks on time constituted unlawful

23   discrimination in violation of Title VII.  See Learned, 860 F.2d at 932-33.  As such, even if

24   defendant retaliated against plaintiff on this basis, defendant has not violated the anti-retaliation

25   provisions of Title VII.

26   B.      State Law Claims

10

1    Having found that plaintiff's Title VII claims should be dismissed, the court

2  recommends against the exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

3  any state law claims (e.g., negligence and breach of contract) the complaint may allege when

4  liberally construed.

5    Although plaintiff has not alleged diversity jurisdiction in his complaint, the court

6  does note that he is presently in New York and that CalPERS is a California-based entity.

7  Additionally, plaintiff has alleged more than $75,000 in damages.  SAC at 5.  Thus, assuming the

8  existence of diversity jurisdiction, the court would nonetheless recommend the dismissal of

9  plaintiff's state law claims pursuant to the Eleventh Amendment.

10    "Under the [E]leventh [A]mendment, agencies of the state are immune from

11  private damage actions or suits for injunctive relief brought in federal court."  Mitchell v. L.A.

12  Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1988).  Congress may abrogate states' sovereign

13  immunity from suit through an express statement of its intent to abrogate and "pursuant to a

14  valid grant of constitutional authority."  Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000).

15  "Section 5 of the Fourteenth Amendment empowers Congress to 'enforce, by appropriate

16  legislation, the provisions of' that article, and state sovereign immunity may be abrogated in

17  service of this goal."  Alaska v. EEOC, 564 F.3d 1062, 1067 (9th Cir. 2009).

18    "[T]he Supreme Court has been cautious in extending state sovereign immunity

19  even to many state-created and quasi-governmental entities."  Del Campo v. Kennedy, 517 F.3d

20  1070, 1075 (9th Cir. 2008).  "The usual issue . . . has been whether a governmental entity is an

21  arm of the state or is better characterized as part of another level of government."  Id. at 1076.

22  "To determine whether a governmental agency is an arm of the state, the following factors must

23  be examined: whether a money judgment would be satisfied out of state funds, whether the entity

24  performs central governmental functions, whether the entity may sue or be sued, whether the

25  entity has the power to take property in its own name or only the name of the state, and the

26  corporate status of the entity."  Mitchell, 861 F.2d at 201.

1    Since there is no constitutional authority for abrogation of state sovereign

2    immunity with respect to negligence and breach of contract claims, this court lacks jurisdiction

3    over any such claims if defendant CalPERS qualifies as an arm of the state. See Kimel, 528 U.S.

4    at 73. The Ninth Circuit has not yet addressed CalPERS' status under the Eleventh Amendment.

5    However, a number of California district courts have concluded that CalPERS is in fact an arm

6    of the state. See, e.g., Barroga v. Bd. of Admin. Cal. Pub. Emps.' Ret. Sys., 2012 WL 5337326,

7    at *5 (E.D. Cal. Oct. 26, 2012); Cal. Pub. Emps. Ret. Sys. v. Moody's Corp., 2009 WL 3809816,

8    at *6 (N.D. Cal. Nov. 10, 2009).

9    In Moody's Corp., the court evaluated CalPERS based on the factors identified in

10   Mitchell. Moody's Corp., 2009 WL 3809816, at *3-6; see Mitchell, 861 F.2d at 201. The court

11   noted that although CalPERS could sue, be sued, and take property in its own name, it lacked

12   corporate status, and it performed central governmental functions. Moody's Corp., 2009 WL

13   3809816, at *4-6. The court also observed that the state legislature was legally obligated to

14   backfill any shortfalls in CalPERS' ability to pay out vested pension benefits to state workers.

15   Id. at *3-4. On balance, the court found these factors cut in favor of viewing CalPERS as an arm

16   of the state. Id. at *6. The court's reasoning is persuasive and should be applied to the present

17   case as well.

18   Since CalPERS, as an arm of the state, benefits from sovereign immunity under

19   the Eleventh Amendment, this court lacks subject matter jurisdiction over any state law claims

20   alleged by plaintiff.

21   C.    Leave to Amend

22   "Under Ninth Circuit case law, district courts are only required to grant leave to

23   amend if a complaint can possibly be saved. Courts are not required to grant leave to amend if a

24   complaint lacks merit entirely." Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000); see also

25   Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1106 (9th Cir. 2004) (citing Doe v. United

26   States, 58 F.3d 494, 497(9th Cir. 1995) ("a district court should grant leave to amend even if no

12

1   request to amend the pleading was made, unless it determines that the pleading could not be

2   cured by the allegation of other facts.")).  "[A] district court retains its discretion over the terms

3   of a dismissal for failure to state a claim, including whether to make the dismissal with or

4   without leave to amend."  Lopez, 203 F.3d at 1124.  "The district court's discretion to deny leave

5   to amend is particularly broad where plaintiff has previously amended the complaint."  Metzler

6   Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1072 (9th Cir. 2008) (quoting In re

7   Read-Rite Corp., 335 F.3d 843, 845 (9th Cir. 2003)).

8           In deciding whether to grant leave to amend, the court finds that, liberally

9   construed, plaintiff's SAC could be read to allege a § 1983 claim for denial of equal protection

10  under the Fourteenth Amendment.  However, because "[a] plaintiff who fails to establish

11  intentional discrimination for purposes of Title VII … also fails to establish intentional

12  discrimination for purposes of § 1983," the court finds that plaintiff has failed to state a claim

13  under 42 U.S.C § 1983.  See Sischo-Nownejad, 934 F.2d at 1112.

14          On review, then, the court finds that dismissal of plaintiff's complaint without

15  leave to amend is appropriate for the following reasons.  First, the court advised plaintiff in its

16  order dismissing plaintiff's amended complaint that he would "be given one last opportunity to

17  amend his complaint."  ECF No. 9 at 4.  Second, the court asked plaintiff at the April 10, 2013

18  hearing on defendant's motion for judgment on the pleadings whether he was aware of any

19  additional facts suggesting defendant had subjected him to discriminatory treatment based on his

20  national origin.  He said there were no additional facts to add.  Finally, plaintiff stated in his

21  opposition to defendant's motion that "there is no need for an amendment."  Pl.'s Opp'n to

22  Def.'s Mot. J. Pleadings 12:25.  On these grounds, the court finds that further amendment would

23  be futile.

24          Accordingly, IT IS THEREFORE RECOMMENDED that:

25      1.      Defendant's motion for judgment on the pleadings be granted with respect

26              to plaintiff's Title VII and § 1983 claims;

13

1        2.      Plaintiff's state law claims—negligence and breach of contract—be

2               dismissed without prejudice for lack of subject matter jurisdiction; and

3        3.      The Clerk be directed to enter judgment in defendant's favor.

4      These findings and recommendations are submitted to the United States District Judge

5 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

6 days after being served with these findings and recommendations, any party may file written

7 objections with the court.  The document should be captioned "Objections to Magistrate Judge's

8 Findings and Recommendations."  Any response to the objections shall be filed and served

9 within seven (7) days after service of the objections.  Failure to file objections within the

10 specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

11 F.2d 1153 (9th Cir. 1991).

12 DATED: May 1, 2013.

13

14                         ALLISON CLAIRE
                         UNITED STATES MAGISTRATE JUDGE

15

16 /mb;arya1354.mjop

17

18

19

20

21

22

23

24

25

26